IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LEG Q LLC, §
§
Plaintiff, §
§
V. § No. 3:17-cv-1559-N-BN
§
RSR CORPORATION, ET AL., §
§
Defendants. §

## MEMORANDUM OPINION AND ORDER GRANTING LEG Q LLC'S APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

LEG Q LLC ("LEG Q") has filed an Application for Judicial Assistance Pursuant to 28 U.S.C. § 1782, *see* Dkt. No. 1 (the "Application"), requesting leave under 28 U.S.C. § 1782 and Federal Rules of Civil Procedure 26, 30, and 45 to issue and serve (1) subpoenas for the production of documents, information, or objects to Quexco, Inc., EB Holdings II, Inc., Quemetco, Inc., RSR Corporation, and Revere Smelting & Refining Corporation and (2) subpoenas for deposition testimony to Quexco, Inc., EB Holdings II, Inc., Quemetco, Inc., RSR Corporation, and Revere Smelting & Refining Corporation.

United States District Judge David C. Godbey has referred the Application to the undersigned United States magistrate judge for determination under 28 U.S.C. § 636(b). *See* Dkt. No. 30.

Quexco, Inc., EB Holdings II, Inc., Quemetco, Inc., RSR Corporation, and Revere Smelting & Refining Corporation jointly filed a response to the Application, *see* Dkt.

No. 25, and LEG Q filed a reply, *see* Dkt. No. 28.

The Court determines that a hearing or oral argument on the Application is not necessary.

For the reasons and to the extent explained below, the Court GRANTS the Application [Dkt. No. 1] and DENIES as moot LEG Q's Motion for a Hearing on LEG Q LLC's Application for Judicial Assistance Pursuant to 28 U.S.C. § 1782 [Dkt. No. 6].

## Background

LEG Q's Application seeks an order under 28 U.S.C. § 1782 "permitting [LEG Q] to subpoena documents and deposition testimony from RSR Corporation ('RSR'), Revere Smelting & Refining Corporation ('Revere'), Quemetco, Inc. ('Quemetco'), Quexco, Inc. ('Quexco'), and EB Holdings II, Inc. ('EB Holdings,' and, together with RSR, Revere, Quemetco, and Quexco, the 'Subpoena Recipients' [or 'Respondents']) for use in a shareholder derivative action it intends to bring in the English High Court on behalf of Eco-Bat Technologies Ltd. ('Eco-Bat' or the 'Company') against Eco-Bat's Chairman and the directors that he controls." Dkt. No. 2 at 1. LEG Q explains that it "is a minority shareholder of Eco-Bat, an English lead recycling company that is dominated and controlled by Howard Meyers ('Meyers'), its Chairman, Managing Director, and indirect majority shareholder"; that "Meyers and the Eco-Bat directors he controls have schemed to enrich Meyers at the expense of Eco-Bat and its minority shareholders, which have been shut out of Eco-Bat's governance and stonewalled in their attempts to gain critical information about the Company"; and that "LEG Q is preparing to commence a shareholder derivative action in the English High Court

against Meyers and other current and former Eco-Bat directors to recover massive losses Eco-Bat has incurred as the result of their misconduct and breaches of their duties." *Id.* (footnote omitted); *see also id.* at 3 ("LEG Q intends to bring a derivative action in the English High Court against six current and former directors of Eco-Bat, including Meyers, to recover for massive losses caused by their breaches of duty to the Company (the 'English Derivative Action').").

"In particular, LEG Q intends to prove that the defendant directors (including Meyers) orchestrated or, at minimum, condoned Eco-Bat's participation in an unlawful cartel to fix the price of scrap automotive batteries in Europe, for which the European Commission fined Eco-Bat over €32 million earlier this year," and "LEG Q also intends to establish that, through a series of improper, procedurally-unsound related-party transactions, the defendant directors siphoned assets from Eco-Bat and redirected them into entities wholly owned and controlled by Meyers and his family." *Id.* at 1-2. "Finally, LEG Q intends to prove that the defendant directors failed to exercise proper corporate governance by rubber-stamping Meyers's self-dealing activities while scrubbing from Eco-Bat's books and records the objections of the directors appointed by the minority shareholders." *Id.* at 2.

According to LEG Q, it "seeks disclosure under Section 1782 to enable it to satisfy its heightened pleading burden under English law – which requires a derivative plaintiff to present evidence in support of its claims promptly after commencing suit, before it can proceed with its claim and later avail itself of the disclosure mechanisms under English law – and to prove its claims at trial," and "Section 1782 is the only

mechanism practically available to LEG Q to obtain the evidence it will need to pursue its claims beyond the initial pleading stage." *Id.*

LEG Q asserts that its Application "satisfies the statutory requirements to obtain disclosure under Section 1782: the Subpoena Recipients are headquartered and maintain their principal places of businesses in this District, and LEG Q seeks discovery from them for use in its contemplated derivative action in London." *Id.* And, LEG Q contends, "all of the factors guiding the Court's discretion under Section 1782 favor LEG Q's petition: LEG Q seeks to serve subpoenas narrowly tailored to its contemplated derivative claims; English courts are receptive to evidence gathered under Section 1782; and LEG Q's application is a good faith request for probative evidence that does not circumvent any discovery prohibition under English law." *Id.*

LEG Q explains that "[e]ach of the Subpoena Recipients possesses documents and information that are likely to be probative of, and relevant to, LEG Q's claims":

> **Quexco.** Although he is Eco-Bat's Chairman and Managing Director, Meyers stores his e-mails and electronic files relating to Eco-Bat on one or more servers owned by Quexco. Glynn-Jones Decl. Ex. 2 ¶ 8.3, Appx. 157. If Meyers has e-mails and electronic files concerning Eco-Bat's cartel activity, its one-sided acquisitions from and management agreements with Meyers-controlled entities, and the breakdown in Eco-Bat's corporate governance – in particular, e-mails and files concerning Meyers's involvement in such matters – they are held by Quexco. In addition, as the parent company of Quemetco and Revere, Quexco can likely provide documents and testimony about Eco-Bat's acquisition of the Indiana, New York, and California lead recycling facilities, the "negotiation" and renewal of the one-sided facilities management agreements for those facilities, and Quemetco's misappropriation of an operating permit for the California facility. *Id.* Ex. 1 at 26, 65-66 & Ex. 2 ¶ 9, Appx. 36, 75-76 & 158-59. Likewise, as RSR's parent, Quexco can presumably provide documents and testimony about RSR's performance under its services agreement with Eco-Bat, including

RSR's practice of charging Eco-Bat to use intellectual property that Eco-Bat paid to develop. *Id.* Ex. 1 at 26, 65 & Ex. 2 ¶ 9.6, Appx. 36, 75 & 159.

**EB Holdings.** As Eco-Bat's majority shareholder, which controls the majority of the appointments to Eco-Bat's Board (i.e., the prospective defendants), EB Holdings likely has relevant information about all aspects of the English Derivative Action, including all of the matters addressed in the preceding paragraph, as well as the collapse of Eco-Bat's corporate governance and the disenfranchisement of Eco-Bat's minority directors.

**RSR, Quemetco, and Revere.** As noted, RSR, Quemetco, and Revere – all owned and controlled by Meyers – entered into one-sided agreements with Eco-Bat pursuant to which Eco-Bat pays significant fees to these companies to operate facilities purchased (but, in practice, never controlled) by Eco-Bat and to use intellectual property that Eco-Bat paid to develop. All three of these companies are likely to have information about the "negotiation" and renewal of these agreements, their fairness (or lack thereof) to Eco-Bat, the parties' performance under such agreements, and the amount of value improperly extracted from Eco-Bat pursuant to them.

*Id.* at 9-10 (footnote omitted).

Respondents assert in response that "LEG Q's Application is part of an ongoing, concerted effort by LEG Q and others to take control of [Eco-Bat] from Respondent EB Holdings and, ultimately, its shareholder Howard Meyers" and that "LEG Q, an activist minority shareholder of Eco-Bat, has longstanding hostilities toward Eco-Bat's management and has used various legal maneuvers to try to gain leverage over Respondents and their affiliates." Dkt. No. 25 at 1. According to Respondents, "[i]n addition to efforts to obtain information in the U.K., LEG Q has filed a separate § 1782 action in Wisconsin, attempted to appear in EB Holdings' pending bankruptcy proceeding (even though LEG Q was not a creditor at the time), and, most recently, purportedly purchasing part of EB Holdings' debt in order to become a creditor in

connection with the Bankruptcy and in a possible effort to gain access to information in a related proceeding in Nevada state court." *Id.*

Respondents assert that "LEG Q's Application, motivated as much by a desire to harass and burden Respondents as by an actual desire for the information, is not a proper use of § 1782"; that "LEG Q is attempting to obtain discovery in connection with a proposed shareholder derivative action to be filed in the U.K."; and that "[p]ermitting such discovery here would circumvent the express rules recently adopted in England that require a party to make an initial *prima facie* showing in order to even maintain a shareholder derivative suit or proceed with discovery." *Id.*

Respondents contend that, "[u]ntil the English court recognizes LEG Q's *prima facie* right to pursue a claim, this Court should not permit LEG Q to obtain discovery" and that "[t]his is especially true where the discovery being sought is extremely burdensome, seeking 'all documents' and at least five depositions on numerous topics for a period of over twenty years." *Id.* at 1-2. Respondent further argue that "there is little doubt that LEG Q could obtain the requested information in various other forums, including directly from Eco-Bat in the U.K." *Id.* at 2.

According to Respondents, "[u]nder these circumstances, this Court should exercise its broad discretion to deny the Application in its entirety" or, "[i]n the alternative, the Court should stay this proceeding until a determination by the English court as to whether LEG Q can make the required *prima facie* showing to proceed with discovery on its shareholder derivative claim," and, "[i]f LEG Q can make such a

showing, then this Court can consider what specific discovery would be proper under § 1782," but, "[i]f LEG Q cannot, this proceeding would be moot." *Id.*

Finally, Respondents contend that, "if the Court is inclined to grant any portion of the Application at this time, it should significantly narrow the scope of the requested subpoenas to include an appropriately-tailored production of documents accompanied by a records custodian affidavit," where "[t]he depositions of numerous corporate representatives would be overly burdensome and is unnecessary." *Id.*; *see also id.* at 18 n.2. More specifically, Respondents assert that "LEG Q's Application seeks vast, overbroad discovery, requesting 'all documents' related to a wide variety of topics over a more than twenty-year period. Specifically, the proposed subpoenas ask for documents and depositions from the Respondents (with the same requests for each Respondent)":

- "All documents" and depositions "concerning Eco-Bat's participating in a[n alleged] cartel" "from January 1, 2006 through the present." Docs. 1-1 at 4; 1-2 at 4; 1-6 at 4; 1-7 at 4."
- "All documents" and depositions "concerning ... the Board of Directors of Eco-Bat" and its members. Docs. 1-1 at 4; 1-2 at 4; 1-6 at 4; 1-7 at 4.
- "All documents" and depositions related to the 1996 Agreement" between Eco-Bat and RSR Corporation" "from September 14, 1995 through the present." Docs. 1-1 at 5; 1-2 at 5; 1-4 at 4; 1-6 at 4; 1-7 at 4; 1-9 at 4.
- "All documents" and depositions related to "the 2003 Facility Agreements" between Eco-Bat on one side and either Quemetco or Revere on the other "from July 31, 2002 to the present." Docs. 1-1 at 5-6; 1-2 at 5-6; 1-3 at 4; 1-4 at 5; 1-5 at 4; 1-6 at 5; 1-7 at 5; 1-8 at 4; 1-9 at 4; 1-10 at 4.
- "All documents" and depositions related to "the 2000 Facility Agreement" on Eco-Bat¡|s 2016 annual report "from May 1, 2000 to the present." Docs. 1-1 at 6; 1-2 at 6; 1-3 at 4-5; 1-4 at 6; 1-6 at 5; 1-7 at 5; 1-8 at 4; 1-9 at 4.

- "All documents" and depositions related to "any Other . . . Agreement" with Eco-Bat. Docs. 1-1 at 6-7; 1-2 at 6-7; 1-3 at 5; 1-4 at 4-5; 1-5 at 4-5; 1-7 at 4; 1-6 at 5; 1-7 at 5; 1-8 at 4; 1-9 at 4; 1-10 at 4.
- "All documents" and depositions concerning licenses or permits "for any facility owned by Eco-Bat." Docs. 1-1 at 7; 1-2 at 7; 1-3 at 5; 1-4 at 7; 1-6 at 5; 1-7 at 4; 1-8 at 4; 1-9 at 5.
- Documents related to the board of directors for each Respondent and each director's financial interests "[f]or the period from September 14, 1995 to the present." Docs. 1-1 at 7; 1-2 at 7; 1-3 at 6; 1-4 at 7; 1-5 at 5.
- "All documents" concerning any potential conflicts of interests of any member of the board of directors of any respondent "from September 14, 1995 to the present." Docs. 1-1 at 7; 1-2 at 7; 1-3 at 6; 1-4 at 8; 1-5 at 5.
- "[A]ll documents" and depositions "show[ing] the amount of and basis for any payments ... to [the potential individual defendants of the U.K. lawsuit] from September 14, 1995 to the present." Docs. 1-1 at 7-8; 1-2 at 7-8; 1-3 at 6; 1-4 at 8; 1-5 at 5; 1-6 at 5; 1-7 at 5; 1-8 at 5; 1-9 at 5; 1-10 at 4.
- "All documents" and depositions related to an "Outstanding Payment ... that Eco-Bat allegedly owes RSR." Docs. 1-4 at 7-9; 1-9 at 5.
- "All documents" and depositions related to "any Other Subsidiary Agreement ... between a subsidiary of RSR on the one hand and Eco-Bat on the other." Docs. 1-4 at 6, 10; 1-9 at 5.

Importantly, almost every request in the proposed subpoenas seeks information within Eco-Bat's control, yet LEG Q would require Respondents to perform a comprehensive search for "all" responsive records spanning a period of up to twenty-two years or more.

      In addition, LEG Q seeks depositions of each of the specified entities. For purposes of at least EB Holdings and Quexco, which are holding companies with minimal or no business operations, the deposition designee for each entity would almost certainly be Meyers or Lospinoso. Thus, the real effect of these depositions requests would be to grant LEG Q an extra, advance deposition of the exact individuals that it seeks to sue in the U.K. But, the Court would be doing so before LEG Q has even established a *prima facie* case to pursue its derivative claims, as required under U.K. law. Neither the U.S. nor U.K. policy countenances premature fishing expeditions of this nature.

*Id.* at 5-7.

Respondents argue that "the discretionary factors [set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004),] weigh heavily against LEG Q's Application":

> First, LEG Q is attempting to seek discovery otherwise available through the U.K. court, the European Commission, the Bankruptcy, or the PIK Loan Litigation. Second, U.K. courts are unlikely to be receptive to the admission of evidence that circumvents their own statutorily-mandated procedures. Third, LEG Q is misusing § 1782(a) in an effort to circumvent U.K. laws specifically limiting a shareholder's access to early discovery for derivative claims. Finally, the discovery sought is unduly intrusive, burdensome and harassing.

*Id.* at 8.

> In the alternative, Respondents contend that,

> [e]ven if the Court is inclined to grant LEG Q's § 1782 Application, the Court should at least stay these proceedings until LEG Q applies to an English High Court for permission and the English High Court has the opportunity to determine whether LEG Q can maintain such a shareholder derivative suit. *Petrus v. Bowen*, 883 F.2d 581, 583 (5th Cir. 1981) ("A trial court has broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined."). Such a stay will ensure that the Court will not, by granting LEG Q discovery, inadvertently undermine the deliberate U.K. policy in the Companies Act, which was adopted to shield parties from being forced to bear the cost of defending shareholder derivative suits before an English court has the opportunity to determine whether the claim should proceed.
> ....
> If this Court is inclined to grant any portion of the Application at this time, it should, at the very least, narrowly tailor the proper discovery. More specifically, the Court should restrict discovery to only relevant document production accompanied by a records custodian affidavit. Depositions should not be permitted at this time. In order to permit the parties to narrowly tailor the discovery, the Court should set a return date under the subpoenas of at least 28 days to allow time for objections regarding the burden as though the subpoenas had been issued to a third party in ordinary U.S. litigation. Respondents should be permitted to raise any objections, move to quash, or seek any protective

order deemed necessary, pursuant to local rules and the Federal Rules of
Civil Procedure.

*Id.* at 19-20.

LEG Q replies that Respondents' argument – asserting that the discretionary
factors support the denial of LEG Q's application or, at a minimum, a stay of these
proceedings – is meritless where (1) the disclosure LEG Q seeks is beyond the English
Court's reach; (2) the English Court is receptive to Section 1782 assistance; (3) LEG Q's
request does not circumvent any English proof-gathering restrictions; and (4) LEG Q
does not seek unduly intrusive or burdensome disclosure. *See* Dkt. No. 28 at 1-15.

## Legal Standards and Analysis

I.    <u>Section 1782 Statutory Requirements</u>

"Three statutory requirements must be satisfied before a district court may
grant assistance under § 1782(a): (1) the person from whom discovery is sought must
reside or be found in the district in which the application is filed; (2) the discovery must
be for use in a proceeding before a foreign tribunal; and (3) the application must be
made by a foreign or international tribunal or any interested person." *Bravo Express
Corp. v. Total Petrochemicals & Refining U.S.*, 613 F. App'x 319, 322 (5th Cir. 2015)
(quoting *Tex. Keystone, Inc. v. Prime Natural Res., Inc.*, 694 F.3d 548, 553 (5th Cir.
2012)).

As LEG Q correctly observes, "Respondents do not contest that LEG Q satisfies
all three" of Section 1782's statutory requirements. Dkt. No. 28 at 1; *accord* Dkt. No.
25 at 7-8. And the Court finds that the statutory requirements are met.

First, LEG Q has shown that EB Holdings, RSR, Revere, Quemetco, and Quexco reside or may be found in the Northern District of Texas "because they are all headquartered and maintain their principal places of business in Dallas." Dkt. No. 2 at 11.

Second, "LEG Q satisfies the second requirement for Section 1782 assistance because it is in the process of commencing the English Derivative Action and intends to use the subpoenaed documents and deposition testimony to obtain permission from the English High Court to continue its derivative claims beyond the pleading stage, as well as to prove those claims at trial." *Id.* at 12. The Court may grant Section 1782 assistance based on "reliable indications of the likelihood that [foreign] proceedings will be instituted within a reasonable time." *Bravo*, 613 F. App'x at 322-23. LEG Q has shown that it "has served a Letter Before Action on the intended defendants in the English Derivative Action and is in the midst of the pre-action correspondence process that typically precedes the filing of a shareholder derivative action in the English High Court, and it intends to commence that action after obtaining discovery pursuant to Section 1782." Dkt. No. 2 at 13.

Third, under 28 U.S.C. § 1782, interested parties, such as LEG Q, may obtain discovery for use in foreign litigation from individuals or entities located within the United States, and, as the prospective claimant in the English Derivative Action, LEG Q is an "interested person" within the meaning of Section 1782. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004).

II.     Section 1782 Discretionary Factors

The United States Court of Appeals for the Fifth Circuit has made clear that, "once an interested party makes the requisite showing that it has met the statutory factors, the district court judge has the discretion to grant the application seeking the authority to issue subpoenas." *Tex. Keystone*, 694 F.3d at 553 & n.2.

Here, the Court finds that the discretionary factors that the United States Supreme Court set out in *Intel Corp. v. Advanced Micro Devices, Inc.*, as "bear[ing] consideration in ruling on a § 1782(a) request" on the whole weigh in favor of granting the Application. 542 U.S. at 265. Those factors include "(1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding,' because 'nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach' and therefore their evidence may be 'unobtainable absent § 1782(a) aid'; (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance'; (3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the § 1782(a) request is 'unduly intrusive or burdensome.'" *Bravo Express*, 613 F. App'x at 323-24 (quoting *Intel*, 542 U.S. at 264-65); *accord Tex. Keystone*, 694 F.3d at 553 n.2.

A.     The first factor

As to the first discretionary factor, the Supreme Court observed in *Intel* that, "when the person from whom discovery is sought is a participant in the foreign

proceeding..., the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad. A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel*, 542 U.S. at 264. "In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*

Here, LEG Q explains that it "does not intend to name any of the Subpoena Recipients as defendants in the English Derivative Action" and that it "also seeks information 'outside the [English High Court's] jurisdictional reach,' a factor favoring Section 1782 assistance." Dkt. No. 2 at 14 (quoting *Intel*, 542 U.S. at 264). LEG Q explains that,

> [f]or example, LEG Q seeks deposition testimony from corporate representatives of the Subpoena Recipients, which the English High Court would lack jurisdiction to compel. Likewise, there is no basis under the English Civil Procedure Rules for LEG Q to obtain pre-action disclosure from the Subpoena Recipients, who will not be parties to the English Derivative Action. Glynn-Jones Decl. ¶¶ 22-24, Appx. 7-8. Although, in limited circumstances, English courts have equitable discretion to order nonparties to provide pre-action disclosure of documents (not testimony), they almost always decline to exercise such discretion where, as here, the nonparties are foreign companies located outside of England and where disclosure may be obtained from them pursuant to Section 1782.

*Id.* at 14-15.

Respondents counter that "the discovery sought is obtainable without the aid of § 1782 in several ways: (1) from Eco-Bat or its individual board members in the

proposed U.K. action; (2) from Eco-Bat or its individual board members through U.K. pre-action procedures; (3) directly from the Respondents through the proposed U.K. action; (4) from the European Commission that investigated the alleged cartel; and (5) via appropriate proceedings in the Bankruptcy or based on the discovery in the PIK Loan Litigation." Dkt. No. 25 at 8-9.

Respondents more specifically assert that (1) "[i]t is evident from the face of LEG Q's discovery requests that the vast majority of the information LEG Q seeks would be available from Eco-Bat, which LEG Q admits would be a defendant in its purported derivative suit," and, "[b]ecause the discovery would be obtainable without the aid of § 1782, the Court should refuse to permit LEG Q to use this burdensome procedure"; (2) "[e]ven at this stage, the relevant evidence is available to LEG Q through Eco-Bat in the U.K. because Rule 31.16 of the U.K. Civil Procedure Rules (aptly titled 'Disclosure before proceedings start') and section 33 of the Senior Courts Act 1981 authorize an English court to grant pre-action disclosure from a likely party to the proceedings"; (3) "LEG Q would also be able to seek the requested discovery directly from the Respondents under the third-party discovery rules in U.K. Civil Procedure Rules 31.17 and 34.2," where "LEG Q has admitted that English courts have authority to grant pre-action disclosure against foreign nonparties, such as Respondents"; (4) "LEG Q can obtain the information it seeks regarding the alleged cartel directly from the European Commission," which "investigated the alleged cartel," and "LEG Q can request the European Commission's files related to the investigation under the European Union Transparency Regulation, which is comparable to the United States

Freedom of Information Act"; and (5) "[n]ow that LEG Q has purportedly purchased an interest in the PIK Loan, it might attempt to obtain the same information it requests here through the ongoing discovery in the PIK Loan Litigation. LEG Q has also sought to appear in EB Holdings' Bankruptcy." *Id.* at 9-12.

As LEG Q correctly notes, "Section 1782 does not require [an applicant] to seek discovery in the foreign jurisdiction before seeking the assistance of a district court." *In re Application of HydroDive Nigeria, Ltd.*, No. 13-MC-0477, 2013 WL 12155021, at *4 (S.D. Tex. May 29, 2013) (citing *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997) ("Similarly, we have held that a district court may not refuse a request for discovery pursuant to § 1782 because a foreign tribunal has not yet had the opportunity to consider the discovery request. Such a 'quasi-exhaustion requirement,' finds no support in the plain language of the statute and runs counter to its express purposes...." (citation omitted))). But a "respondent's connection to the foreign proceeding is part of a broader inquiry: whether the discovery is 'outside the foreign tribunal's jurisdictional reach,' and thus 'unobtainable absent § 1782(a) aid.'" *In re Kiobel*, No. 16 CIV. 7992 (AKH), 2017 WL 354183, at *5 (S.D.N.Y. Jan. 24, 2017) (quoting *Intel*, 542 U.S. at 264).

In reply, LEG Q attempts to make that showing, asserting that, "[i]n applying the first *Intel* factor, courts focus on whether the discovery may be had from the foreign tribunal (here, the English High Court), not whether it can be obtained elsewhere." Dkt. No. 28 at 1-2 (emphasis removed).

As far as the first discretionary factor is concerned, the Court is persuaded that "[t]he evidence LEG Q seeks is not within the reach of the English High Court" and that there is no "basis for Respondents' (legally irrelevant) assertion that such evidence is likely to be forthcoming from other sources in the absence of Section 1782 aid." *Id.* at 2.

As LEG Q points out, Eco-Bat already "rejected [a] request [for voluntary disclosure], and it is likely to oppose any formal application to the English court for pre-action disclosure." *Id.* at 2-3 (footnote omitted). *Cf. Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 376, 377 (5th Cir. 2010) ("[The plaintiffs] argue that allowing Chevron to seek discovery from 3TM in the United States is inappropriate, since Cabrera is subject to the jurisdiction of the Ecuadorian court and Chevron could ask him to turn over any 3TM documents he reviewed. .... "[w]e find it senseless to require Chevron to seek 3TM documents from Cabrera, given the plaintiffs' denial that they provided any such documents to Cabrera and Cabrera's interest in denying receipt of 3TM material. As noted above, the Ecuadorian court ordered Cabrera to disclose all of the source material for his report. Consequently, if Cabrera relied on 3TM documents but did not disclose them, he is unlikely to turn them over now, as doing so would reveal he violated the Ecuadorian court's order.").

And, as LEG Q persuasively demonstrates, "[t]hat the evidence LEG Q seeks is 'related' to Eco-Bat does not mean that it is 'held by' Eco-Bat," as Respondents assert. Dkt. No. 28 at 3.

Further, LEG Q asserts that "English civil procedure does not authorize nonparty document discovery pre-action, and even after an action commences, U.S. based nonparties (such as Respondents) may assert jurisdictional objections to such discovery"; that, "both before and after litigation commences, English courts cannot compel testimony from nonparties (such as Respondents) located outside the territorial boundaries of the United Kingdom"; and that, while "English courts have 'equitable discretion' to order pre-action document disclosure from nonparties," "English courts almost always decline to exercise such discretion, especially when tools such as Section 1782 are available in the jurisdiction where disclosure is sought." Dkt. No. 28 at 4-5 (internal quotation marks omitted).

Respondents' assertion that LEG Q can seek the discovery that LEG Q wants directly from Respondents in England is, the Court concludes, at best half-right.

As for Respondents' argument that LEG Q can obtain the evidence it seeks from the European Commission or in other domestic proceedings, the Court agrees with LEG Q that this is legally irrelevant to the first discretionary factor's inquiry and that, even if LEG Q could obtain the European Commission investigation file, it would not provide all that LEG Q is seeking.

The Court concludes that, on balance, this first factor weighs in favor of granting LEG Q's Application.

B.    The second factor

As to the second discretionary factor, LEG Q correctly asserts that "Section 1782 applications should be denied based on a foreign jurisdiction's lack of receptivity to the

evidence sought only where there is 'authoritative proof' – in the form of a judicial, executive, or legislative declaration – that the foreign jurisdiction would be hostile to such evidence." Dkt. No. 28 at 15 (citing *Ecuadorian Plaintiffs*, 619 F.3d at 377 (noting that "there has been no 'clear directive' from the Ecuadorian court that it 'would reject evidence' produced in the United States")). LEG Q notes that "English courts are not hostile to discovery gathered under Section 1782 – just the opposite"; that "[t]he House of Lords has ruled that litigants in English proceedings can seek assistance from U.S. courts under Section 1782 even if the information they seek would not be discoverable under English law"; and that "federal courts regularly grant Section 1782 applications to gather discovery for use in English litigation." *Id.*

Respondents counter that "English law has adopted a procedure exclusively for shareholder derivative suits, through which a party must first 'disclose' a *prima facie* case in an application to an English court for permission to maintain a shareholder derivative claim"; that, "[b]ased on this prima facie showing, a court will determine whether to allow the case to continue or order discovery of evidence"; and that, "[b]ecause the very purpose of the English procedure is to save parties and nonparties from costly discovery for nonmeritorious claims, it is reasonable to conclude that English Courts would disfavor consideration of evidence obtained through extraordinary measures prior to meeting the *prima facie* threshold." Dkt. No. 25 at 12-13. Asserting that "LEG Q has failed to cite any authority indicating that an English court would be receptive to evidence acquired pre-action for use in a shareholder derivative suit," Respondents contend that, "in light of the fact that an English court

would likely disfavor using evidence that circumvents the procedures and policy of the Companies Act, the Court should weigh this factor against granting the Application." *Id.* at 13.

Respondents are attempting in invert the burden here. The United States Court of Appeals for the Fifth Circuit has held that, "to avoid 'speculative foray[s] into legal territories unfamiliar to federal judges, parties must provide authoritative proof that a foreign tribunal would reject evidence because of a violation of [an] alleged [foreign] privilege." *Ecuadorian Plaintiffs*, 619 F.3d at 378 (internal quotation marks). Respondents' suppositions and inferences – whether reasonable or not – are not the same as a clear directive or authoritative proof that the English High Court would reject evidence obtained with the aid of section 1782.

The Court determines that the second factor does not weigh against an exercise of discretion in LEG Q's favor.

C.    The third factor

As to the third discretionary factor, as another court in this circuit has explained, in *Intel*, the "Supreme Court noted that '[w]hile comity and parity concerns may be important touchstones for a district court's exercise of discretion in particular cases, they do not permit our insertion of a generally applicable foreign-discoverability rule into the text of § 1782,'" but "the Court also instructed that district courts consider 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States,'" such that, "while the court should not base its § 1782(a) decision on whether

this discovery would be allowed in [England], it may consider [English] restrictions and whether this request is an attempt to thwart those restrictions." *In re Application of RSM Prod. Corp. v. Noble Energy, Inc.*, 195 F. Supp. 3d 899, 906 (S.D. Tex. 2016) (quoting *Intel*, 542 U.S. at 261, 264); *see also id.* ("In *Mees* [*v. Buiter*, 793 F.3d 291 (2d Cir. 2015)], the Second Circuit noted that § 1782 'contains no foreign-discoverability requirement,' and that while district judges "may well find that in appropriate cases a determination of discoverability under the laws of the foreign jurisdiction is a useful tool in their exercise of discretion under section 1782," district courts should not outright deny discovery under § 1782 'solely because such discovery is unavailable in the foreign country.'" (quoting *Mees*, 793 F.3d at 303)).

Respondents argue that the English rule requiring a plaintiff to make an initial *prima facie* showing to even maintain a derivative suit or proceed with discovery is itself a "proof-gathering restriction" intended to weed out meritless claims before discovery commences. *See* Dkt. No. 25 at 1, 13, 15-16.

LEG Q replies that the fact "[t]hat English law does not afford litigants a mechanism to take nonparty discovery in certain contexts (preaction) or through certain means (depositions) does not mean that English courts prohibit the use of evidence lawfully gathered under recognized U.S. procedures that lack an English counterpart"; that "Respondents' argument to the contrary relies, improperly, on importing a 'foreign-discoverability requirement' into Section 1782"; and that "[t]he mere fact that the discovery sought ... might not be obtainable under English law does not, by itself, suggest that LEG Q's Section 1782 application is an attempt to

circumvent foreign proof-gathering restrictions." Dkt. No. 28 at 10-11 (internal quotation marks omitted). According to LEG Q, "[f]or precisely this reason, federal courts routinely authorize nonparty depositions under Section 1782 in connection with English proceedings, even though English procedure does not permit U.S. style depositions." *Id.* at 11 (footnote omitted). LEG Q urges the Court to follow the lead of the United States Court of Appeals for the Second Circuit, which has explained that "[t]hat a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means. '[P]roof-gathering restrictions' are best understood as rules akin to privileges that prohibit the acquisition or use of certain materials, rather than as rules that fail to facilitate investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Mees*, 793 F.3d at 303 n.20.

The Court finds that LEG Q has the better of this argument as to this factor. As LEG Q notes, "Respondents cite no rules that 'prohibit' LEG Q from using Section 1782 documentary or deposition evidence to make a *prima facie* showing supporting its derivative claims (or to prove its claims at trial, LEG Q's other planned use for the evidence). Nor do they cite any evidence that granting LEG Q's application would pit this Court against, or contradict any rulings of, the English court." Dkt. No. 28 at 12. The Court agrees that the English High Court's possible restriction on permitting discovery through a matter before it does not equate to forbidding a party seeking to bring a derivative action from obtaining proof in support of a *prima facie* showing by other means. Further, Respondents' arguments on the first and third discretionary

factors appear to be somewhat at cross-purposes, where they asserted as to the first that "LEG Q has admitted that English courts have authority to grant pre-action disclosure against foreign nonparties, such as Respondents." Dkt. No. 25 at 11.

The Court is persuaded that, under these circumstances, LEG Q's Application does not conceal an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States and that this factor weighs in favor of granting the Application.

D. The fourth factor

As to the fourth discretionary factor, LEG Q correctly notes that "[t]he intrusiveness and burden of Section 1782 disclosure are evaluated under the same standards that typically govern discovery requests under the Federal Rules of Civil Procedure." Dkt. No. 2 at 17 (citing *Tex. Keystone*, 694 F.3d at 554); *accord Mees*, 793 F.3d at 302 (explaining that "a district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure"). LEG Q contends that "[t]he disclosure that [it] seeks from the Subpoena Recipients is narrowly tailored to the claims LEG Q intends to assert in the English Derivative Action and is intended to be framed in a manner that would be acceptable to the English High Court" and that "[t]he proposed subpoenas – which contain a handful of document requests and deposition topics – seek disclosure on the limited number of issues that connect each Subpoena Recipient to LEG Q's claims." *Id.*

Respondents counter that "[r]equests are unduly intrusive and burdensome where they are not narrowly tailored, request confidential information and appear to be a broad 'fishing expedition' for irrelevant information" and that, "[h]ere, LEG Q's request is overly broad and unduly intrusive." Dkt. No. 25 at 17.

According to Respondents, "almost every request for documents seeks 'all documents' related to each category for excessively long periods of time." *Id.* (emphasis removed). Respondents argue that "LEG Q's requests place an enormous burden on the Respondents by requesting a cumbersome amount of documents spanning a period of over twenty years or, potentially more" and LEG Q's "requests are extremely burdensome for a third party, particularly when most or all of the information could be obtained from a party to the potential lawsuit, and it is not certain that the lawsuit will actually be filed or will be allowed to continue past the initial *prima facie* stage." *Id.* at 18. And, Respondents contend, "LEG Q's subpoena requests presume Respondents' access to relevant information regarding Eco-Bat's internal governance and further fail to justify the burdensome costs of production, which would include mining servers for e-mails and electronic files and retrieving unspecified documents related to acquisitions and service agreements." *Id.*

Respondents further assert that "LEG Q's requests for depositions are also extremely burdensome and intrusive" and that, "[b]ecause the topics span twenty-plus years and various subject matters, simply preparing corporate representatives on the broad range of topics would be a significant undertaking." *Id.* "Moreover, in the case of at least EB Holdings and Quexco, which are holding companies with no business

operations, the designated witnesses would have to be Meyers or Lospinoso, both of whom are purported targets of LEG Q's derivative action in the U.K.," and Respondents argue that "it would be improper to permit LEG Q to take depositions of those individuals pursuant to § 1782, when LEG Q would not otherwise be permitted to obtain such discovery at this point in the U.K." *Id.* at 18-19.

LEG Q replies that "Respondents have neither substantiated their conclusory assertions of burden nor met and conferred with LEG Q concerning its requests" and that "[t]his is fatal" where "[i]t is broadly accepted that courts evaluating Section 1782 applications under *Intel*'s fourth factor should give no weight to burden objections, or impose limits on the disclosure sought, where the respondent lays no empirical foundation for its contention of undue burden, including by estimating the number of documents that it would be required to provide ..., the number of hours of work by lawyers ... required, and the expense, and has made no effort to negotiate the scope of disclosure." Dkt. No. 28 at 12 (internal quotation marks omitted).

LEG Q further contends that, "while urging the Court to 'significantly narrow the scope' of LEG Q's requests, [Dkt. No. 25] at 18 n.2, Respondents neither propose nor justify any specific modifications." *Id.* at 13. And LEG Q argues that "Respondents' conclusory burden arguments are without merit:"

- Respondents falsely assert that many of LEG Q's requests are "without any time limitation" or lack "temporal scope," Opp. at 17, when the very first instruction in LEG Q's proposed subpoenas defines a default time period (January 2006 to the present).
- Respondents' scope objections to LEG Q's requests beg the question of how burdensome it would be for them to identify and produce responsive documents. For example, the burden associated with

LEG Q's request for documents concerning any "actual or potential conflict of interest" held by Meyers or other Eco-Bat directors, *see, e.g.*, App. Ex. 1 at Request No. 10, may be minimal, unless the subject of such director conflicts regularly arose.

- As Respondents have acknowledged, EB Holdings and Quexco are holding companies "with minimal or no business operations." Opp. at 6. This implies that they will have only a few custodians (one of whom is Meyers, who keeps his email on a Quexco server), and that the burden of collecting and reviewing documents from them would be minimal.

- Respondents' suggestion that LEG Q can avoid burdening them by seeking disclosure from Eco-Bat, Opp. at 18, ignores LEG Q's showing that Respondents have unique evidence.

*Id.* (footnotes and citation omitted).

Finally, LEG Q asserts that, although "Respondents also assert that LEG Q's deposition requests will result in an 'extra, advance deposition' of Meyers or Lospinoso – intended defendants in LEG Q's derivative action and allegedly the only 'employees or representatives' of EB Holdings and Quexco – and therefore impose an undue burden," "[t]his is a complete red herring" where Federal Rule of Civil Procedure "30(b)(6) allows each Respondent to designate as a corporate representative any 'one or more ... persons who consent to testify on [its] behalf,' and those persons need not be 'officers, directors, or managing agents' of the Respondents." *Id.* at 18-19 (quoting FED. R. CIV. P. 30(b)(6)).

The Court is persuaded that, on this record, this factor weighs in favor of granting the Application. Respondents do not specify and quantify the burden that they assert and do not suggest how the requests should narrowed other than to complain about the use of "all documents" and the time frame for each document request. Respondents also appear to seek to shift the burden to LEG Q to establish

with certainty that Respondents have access to relevant information regarding Eco-Bat's internal governance – which, whether required to do so or not, LEG Q has in fact sought to do in support of its Application. And the Court is not convinced that Respondents' hope that the English Derivative Action may not actually be filed or be allowed to continue past the initial *prima facie* stage does not make unduly burdensome any discovery that would permit LEG Q to attempt to support a *prima facie* showing if and – as LEG Q reports that it intends – when LEG Q does file the English Derivative Action.

As for the deposition subpoenas, Respondents can, as LEG Q notes, designate any appropriate representative for corporate representative testimony, and the Court does not believe it appropriate under the circumstances to deny a Section 1782 application based on the respondents' assertion of who they may unilaterally decide to put up to testify. Under the circumstances, the Court does not find that the taking of corporate representative depositions of Respondents is in and of itself unduly intrusive, burdensome, and harassing.

And all of these concerns – including the breadth of topics in the deposition subpoenas – can properly be addressed through the mechanisms, including objections and motions, specifically provided by Rule 45. Respondents will not be precluded from challenging the subpoenas, once issued, under any applicable local rules and the Federal Rules of Civil Procedure, including as being unduly burdensome, irrelevant, or overly broad. *See Tex. Keystone*, 694 F.3d at 554 (explaining that the Federal Rules of Civil Procedure govern discovery requests once the district court grants a Section

1782 application); *accord Grupo Mexico SAB de CV v. SAS Asset Recovery, Ltd.*, 821 F.3d 573, 574 (5th Cir. 2016) ("Significantly, unless the court orders otherwise, the testimony or documents shall be produced in accord with the Federal Rules of Civil Procedure. 28 U.S.C. § 1782(a)."). But, before filing any subpoena-related motion, Respondents will be required to first confer by telephone or meets face-to-face with LEG Q's counsel to meaningfully discuss each contested discovery dispute in a genuine effort to avoid the need for any judicial intervention. *See, e.g.*, *Dondi Properties Corp. v. Commerce Savs. & Loan Ass'n*, 121 F.R.D. 284, 289-90 (N.D. Tex. 1988); N.D. TEX. L. CIV. R. 7.l(a).

Accordingly, "informed by the twin aims of the statute, which are to provide efficient means of assistance [in our federal courts] to participants in international litigation ... and to encourage foreign countries by example to provide similar means of assistance to our courts," *Bravo Express*, 613 F. App'x at 321 (internal quotation marks omitted), the Court will exercise its discretion to grant the Application.

III.    Respondents' Request for a Stay

Further, the Court determines that a stay is not justified here where, as more fully explained above, LEG Q should not be deprived of the opportunity that Section 1782 properly affords here to seek discovery under Rules 26, 30, and 45 to attempt to support a *prima facie* showing in the English Derivative Action.

## Conclusion

The Court GRANTS LEG Q LLC's Application for Judicial Assistance Pursuant to 28 U.S.C. § 1782 [Dkt. No. 1] and ORDERS that LEG Q LLC is authorized under 28

U.S.C. § 1782 and Federal Rules of Civil Procedure 26, 30, and 45 to issue – with a return date of at least 28 days – and serve (1) subpoenas for the production of documents, information, or objects to Quexco, Inc., EB Holdings II, Inc., Quemetco, Inc., RSR Corporation, and Revere Smelting & Refining Corporation, substantially in the form of Dkt. Nos. 1-1 to 1-5, respectively, and (2) subpoenas for deposition testimony to Quexco, Inc., EB Holdings II, Inc., Quemetco, Inc., RSR Corporation, and Revere Smelting & Refining Corporation, substantially in the form of Dkt. Nos. 1-6 to 1-10, respectively.

The Court further ORDERS that the Federal Rules of Civil Procedure and any applicable local rules will apply to discovery pursuant to this order and that deposition testimony obtained pursuant to these subpoenas may be taken before any certified court reporter authorized to take testimony and administer oaths in the State of Texas.

SO ORDERED.

DATED: August 31, 2017

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE